**AFFIDAVIT IN SUPPORT OF A COMPLAINT AND WARRANT**

I, Kevin M. Lewis, a Special Agent with the Federal Bureau of Investigation ("FBI"), Philadelphia Division, being duly sworn, depose and state as follows:

**INTRODUCTION**

1. I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18 of the United States Code, in that I am empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516. I have been employed as a Special Agent with the FBI since September 1996. Since February 1998, I have been assigned to the Philadelphia FBI Safe Streets Violent Drug Gang Task Force ("SSVDGTF"), which investigates, among other violations of federal law, criminal groups including those involved in the importation, distribution, and manufacturing of controlled substances, the laundering of the proceeds of those activities, weapons violations, and any and all tangential violence associated with the drug trade. I have specialized training and experience in narcotics distribution and money laundering investigations, including, but not limited to, the means and methods used by traffickers to purchase, transport, store, and distribute narcotics and to hide profits generated from those transactions. Prior to being employed as a Special Agent, I served seven years as a Tactical and Signals Intelligence officer in the United States Army.

2. The information contained in this affidavit comes from my own personal observations and from the observations of other law enforcement agents and officers involved in this investigation. Because this affidavit is being submitted for the limited purpose of securing an arrest warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only those facts that I believe are necessary to establish probable

cause that FARID HADDAD, Gregory Jones (charged elsewhere), and others known and unknown, conspired and agreed to distribute 500 grams or more of cocaine, a Schedule II controlled substance, in violation of 21 U.S.C. § 846.

**BACKGROUND OF INVESTIGATION**

3. GREGORY JONES is a bulk cocaine trafficker who has distributed cocaine in the Philadelphia area since the early 2000s. In 2009, following a nine-day jury trial in the United States District Court for the Eastern District of Pennsylvania, JONES was convicted of conspiracy to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. §§ 846 and 841(a)(1), (b)(1)(A) and attempted possession with intent to distribute five kilograms of cocaine, in violation of the same. On March 30, 2012, JONES was sentenced to 216 months' imprisonment to be followed by five years of supervised release. On April 26, 2022, JONES received a Presidential commutation. JONES was released from confinement on April 26, 2023. JONES is presently on supervised release in this district.

4. EDWARD BASLEY is similarly a bulk cocaine trafficker who has distributed cocaine in the Philadelphia area since the early 2000s. In 2007, following a jury trial in the United States District Court for the Eastern District of Pennsylvania, BASLEY was convicted of distribution of cocaine, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C); possession with intent to distribute more than 50 grams of cocaine base ("crack"), in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A); possession with intent to distribute more than 500 grams of cocaine, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(B); possession of a firearm in furtherance of a drug-trafficking crime, in violation of 18 U.S.C. § 924(c)(1); and possession of a firearm by a felon, in violation of 18 U.S.C. § 922(g)(1). On October 7, 2008, BASLEY was sentenced to 300 months' imprisonment. On March 7, 2019, pursuant to the First Step Act, BASLEY's sentence was reduced to 180

months' imprisonment. BASLEY was released from confinement on October 18, 2019. BASLEY is presently on supervised release in this district.

5. FARID HADDAD is a Philadelphia-based cocaine trafficker who is supplied bulk quantities of cocaine by JONES for further distribution to HADDAD's customers. HADDAD has prior arrests for Aggravated Indecent Assault, Witness Intimidation, Possession with Intent to Distribute, and Criminal Use of a Communication Facility, although his only conviction was for the possession of controlled substances in 2025.

6. For more than a year, the FBI has been investigating JONES, BASLEY, HADDAD and others known and unknown for drug trafficking and money laundering offenses. Through this investigation, agents have learned that JONES and BASLEY are high-ranking members of a drug trafficking organization ("DTO") who distributes kilogram quantities of cocaine, primarily in the Philadelphia area. JONES regularly obtained bulk cocaine through multiple channels, but primarily from Mexico. The investigation has shown that the cocaine is concealed within tractor trailers and smuggled into the United States through the Mexican border. The cocaine is then driven by tractor trailer drivers to its ultimate destination in Philadelphia or the surrounding areas. Once the tractor trailer arrives, JONES meets with the tractor trailer driver and obtains the bulk cocaine that he and others distribute in kilogram amounts on behalf of the DTO in the Philadelphia area.

7. JONES obtains bulk cocaine from multiple sources, including from a Mexico-based source of supply ("SOS Mexico") who coordinates the delivery of and payment for bulk cocaine concealed within tractor trailers. In addition, JONES supplements his supply of cocaine through smaller cocaine purchases from other individuals within the DTO.

8. On or about March 13, 2026, the Honorable Gerald A. McHugh signed orders under 26-WT-2001-1 authorizing the interception of both oral communications and the recording of visual, non-verbal conduct within JONES' BMW vehicle (JONES' BMW). Pursuant to Judge McHugh's order, the FBI surreptitiously installed both listening devices as well as a video camera in the passenger compartment of JONES' BMW. Interceptions began on March 16, 2026.

9. As part of this investigation, agents identified numerous cellular telephones used by JONES, as well as other members of this DTO and multiple truck drivers. At various times, pursuant to search warrants, agents monitored location data or "pings" for these various phones. Agents also made extensive use of physical surveillance, used Philadelphia Police surveillance cameras, pole cameras, and at times, aerial surveillance. The FBI installed fixed pole cameras providing coverage of various stash houses, residences, and other locations relevant to this DTO's operation.

10. During the authorization period for the Title III interceptions, agents also monitored JONES in real time as he spoke with other drug traffickers, drug customers, sources of supply, and drug and money couriers working on behalf of his source of supply. These conversations occurred both in person, in or around the BMW, as well as on the telephone using traditional calls, FaceTime video calls, and encrypted messaging applications. HADDAD was one such individual intercepted during this investigation.

## PROBABLE CAUSE

### *March 16, 2026 – GREGORY JONES MEETS TRACTOR TRAILER AND ACCEPTS BULK DELIVERY OF COCAINE*

11. On March 16, 2026, the first day of wire interceptions on JONES' vehicles, agents intercepted JONES speaking with his Mexico SOS to coordinate a meeting with a truck driver. JONES then drove his BMW to a truck parking lot in the Bridesburg section of

Philadelphia. In that lot, as captured on the wire from inside JONES' BMW, JONES met with a truck driver working with the Mexico-SOS. The truck driver gave JONES a large duffel bag from inside of the truck cab. Immediately following the exchange between JONES and the driver, JONES drove his BMW to a stash house. While JONES drove to the stash house, agents intercepted JONES speaking with another person on the phone. During the conversation, JONES indicated he had just received "58." Based upon my training and knowledge of this investigation, I believe JONES was confirming that he had just received 58 kilograms of cocaine from the truck driver.

12. In the days that followed this delivery, JONES met with multiple drug customers and provided them with kilograms of cocaine.

***March 18, 2026 - GREGORY JONES MEETS WITH FARID HADDAD TO DELIVER COCAINE AND COLLECT MONEY***

13. On March 18, 2026 agents monitoring communications within JONES' BMW intercepted multiple meetings and calls between JONES and an individual, later identified as the defendant FARID HADDAD. The first meeting, occurred at approximately 9:55am inside JONES' BMW. During the meeting, the audio bug captured JONES unzipping a bag before HADDAD entered the BMW. After HADDAD got in the car, JONES told him "man, it's like little, tiny rocks, see what I'm saying?" I believe, based upon my training and experience, that JONES was describing the appearance of cocaine he was providing to HADDAD. After obtaining this cocaine from JONES, HADDAD said, "Alright I'll call you" before getting out of the BMW.

14. Later the same evening, at approximately 8:30pm, agents intercepted JONES again meeting with HADDAD. During the meeting, HADDAD told JONES, "I got the money from youngin' in my trunk." JONES responded, "You ain't got the money, your money?"

HADDAD said, "It's at my spot. But I'm going to my spot right now. Follow me." I believe, based upon my training an experience that during this meeting, HADDAD and JONES discussed payment for cocaine.

15. At approximately 8:50pm, JONES met with HADDAD in the vicinity of JONES' BMW. This meeting was captured both by the audio equipment within the BMW and also a fixed surveillance camera in the area. HADDAD approached the BMW and opened the passenger side door of the BMW, after which he said "85," which I believe is a reference to HADDAD's repayment of $8,500. I know, from my training and experience, that this amount of money being repaid is consistent with JONES having delivered approximately a half kilogram to HADDAD earlier that morning. JONES then responded, "Man, my man just charged a (expletive) 19 for a chump. And the only reason why I know is because he told me charged the (expletive) 18, right? So he pulled a stack off the money." JONES continued, "He like man, count the rubber bands and make sure there's 17 of them, so I'm like alright, I did it and I'm like 'I don't know, it's 18." JONES said the man then offered to count it when he got home. According to JONES, this other man called him back and said, "I don't know, I might've told him 19…" HADDAD laughed in response to this story. I believe, based upon my training and experience, that JONES was relaying to HADDAD a conversation JONES had with another drug trafficker customer of his, in which the other trafficker haphazardly, and accidentally let JONES learn that the trafficker was charging "19" or $19,000 per kilogram ("a chump") of cocaine that the trafficker obtained from JONES. This story tells me, based on my training and experience, that JONES was both comfortable enough with HADDAD to relate what he believed was a humorous story about another kilogram-level drug trafficker customer, and that HADDAD was likewise aware that

JONES was supplying other drug traffickers with kilograms of cocaine at the same time HADDAD was receiving his own deliveries from JONES.

***June 23, 2026—JONES DISCUSSES SUPPLY ISSUES WITH THE SUPPLIER***

16. On June 23, 2026, at approximately 9:16pm, agents monitoring communications within JONES' BMW intercepted a FaceTime call between JONES and the SOS Mexico. During the call, a third man acted as a translator for the supplier. During the call, JONES told the SOS Mexico that he identified two potential truck drivers that "already do it" but that he was not sure if they "[went] to Texas." JONES asked what they were "offering pay wise." The SOS Mexico told JONES that they would pay the person who found the driver "$50 for each piece every time." The SOS Mexico told JONES they would "need his information" and a "picture of his license where he lives" and "what he drives." The SOS Mexico told JONES to tell the prospective driver "If he does something funny or tries to rob them, they will cut his head off." The SOS Mexico asked JONES to call them when he "talked to the driver." JONES told the SOS Mexico they "need work up here bad." The SOS Mexico told JONES that they had a driver "in training" but were looking for more. The SOS Mexico explained that the driver is "coming back with some money" and as soon as he dropped off the money, they are "going to send him back out with the work." The SOS Mexico told JONES that the driver would "be there either Saturday or Sunday" and that they would let JONES know. JONES asked where the driver was "taking the work." The SOS Mexico told JONES that it is going to another drug trafficker, but "if it takes a little longer it will go to" JONES. The SOS Mexico told JONES that they are waiting for the driver "to come with the money, so they can send him back" to JONES. After the call ended, JONES said out loud to himself, "Why isn't the work coming here?" Based on my training, experience, and this investigation as a whole, I believe that during this call, JONES and the SOS

Mexico discussed an anticipated delivery of cocaine that is scheduled to come to either Philadelphia or another location.

***June 24, 2026 - GREGORY JONES MEETS WITH FARID HADDAD TO DELIVER COCAINE AND COLLECT MONEY***

17. On June 24, 2026, at approximately 3:20pm, agents monitoring communications within JONES' BMW intercepted a meeting between JONES and HADDAD. During the meeting, JONES and HADDAD initially discussed an outstanding debt owed by another customer. JONES commented that he knew the customer was, "looking for work." I know based on my training and experience that work is a reference to cocaine. JONES and HADDAD then discussed challenges in the cocaine market. JONES commented, "They're selling points for $3,000." I know based on my training and experience that a point is a reference to an amount of cocaine. During the interaction, cameras inside JONES' BMW captured JONES handing HADDAD approximately 500 grams of cocaine.

18. Later that day, at approximately 5:51pm, agents monitoring communications within JONES' BMW intercepted another meeting between JONES and HADDAD. During the meeting, JONES and HADDAD provided payment for the earlier provided cocaine and discussed the future sale of cocaine. JONES told HADDAD, "Somebody is supposed to have something tomorrow. The number might be a little better too." HADDAD then told JONES, "Alright, that's two twos and one stack. Two, four, six, eight and one stack." JONES then confirmed, "Alright, that's nine," and further commented, "he's supposed to have something tomorrow." Based on my training and experience, I believe that during this interaction, HADDAD provided payment to JONES for the earlier provided cocaine and discussed the future sale of cocaine at a better price ("a better number") that JONES expected to arrive the following day.

***June 26, 2026—EXECUTION OF SEARCH WARRANTS ON 4902 WYALUSING AVENUE AND 1953 PLYMOUTH STREET AND SEIZURE OF EVIDENCE***

19. On June 26, 2026, agents monitoring communications within JONES' BMW intercepted a call between JONES and the SOS Mexico. During the call, the SOS Mexico alerted JONES that a truck was en route to the Philadelphia area and was approximately three hours away. Agents observed JONES traveling to the area of Southwest Philadelphia where he parked his BMW. Agents then observed a tractor trailer park nearby. Agents further observed JONES exit his BMW carrying a package and approach the tractor trailer and converse with the driver, later identified as EDUARD NAHUN CHIRINOS AMADOR. JONES exchanged the package with CHIRINOS AMADOR and retrieved at least one duffel bag from the truck, which JONES then placed into his BMW and departed the area. Agents continued monitoring JONES' location as JONES drove to his workplace located at 4902 Wyalusing Avenue, Philadelphia, PA. Once at his workplace, pole cameras covering the area showed that JONES parked his BMW, removed a bag from the BMW, and entered his workplace carrying the bag. A short time later, JONES exited his workplace and stood on the front steps of the building until BASLEY arrived driving a Honda Pilot. JONES then removed a duffle bag from his BMW and put it into BASLEY's Honda Pilot.

20. Agents conducting surveillance then observed BASLEY leave 4902 Wyalusing Avenue and drive to his known stash house located at 1953 Plymouth Street, Philadelphia, PA. Agents executed a federally authorized search and seizure warrant at 1953 Plymouth Street. Inside, agents encountered BASLEY and recovered multiple brick shaped objects marked with "gulfstream" which each containing a white powdery substance that appeared to be consistent with kilogram quantities of cocaine on the kitchen counter. In the basement, agents recovered a duffel bag consistent with the one JONES put into BASLEY's Honda Pilot. Inside the duffel bag

agents found additional suspected kilograms of cocaine, each also marked with "gulfstream." In total, agents recovered 33 suspected kilograms of cocaine. Agents conducted a field test on one of the suspected kilograms, which returned a positive result for cocaine. Agents also recovered two firearms in the kitchen and an additional firearm in the basement, specifically a black Smith and Wesson semiautomatic handgun, a black Taurus semiautomatic handgun, and a Ruger semiautomatic handgun.

21. Agents then executed a federally authorized search warrant at 4902 Wyalusing Avenue. Agents encountered JONES in the parking lot and provided JONES with his *Miranda* warnings. JONES led agents to a locked cabinet within his workplace. Inside the cabinet, which JONES had a key to, agents found and recovered 21 brick shaped objects, each containing a white powdery substance that appeared to be consistent with kilogram quantities of cocaine and stacks of money. Agents then searched JONES' BMW and recovered an additional 36 suspected kilograms of cocaine. Agents field tested one of the suspected kilograms of cocaine, which returned positive for cocaine.

22. Also, within the Wyalusing Avenue address, agents found and recovered bundles of cash tightly wrapped in electrical tape, totaling more than $200,000. I know from my training and experience that drug traffickers often wrap money in electrical tape in preparation for transport to avoid apprehension and detection by law enforcement.

23. Agents also stopped CHIRINOS AMADOR in Maryland and recovered bulk cash from inside his truck.

24. Based upon my review of the items located and seized as set forth above, and based upon my training and experience, I believe the cocaine seized was possessed in a manner consistent with distribution and that JONES and the others were involved in distributing cocaine.

I further believe that the money found inside 4902 Wyalusing Avenue was packaged in a manner consistent with drug trafficking. Moreover, I believe based upon my training and experience, that the presence of the firearms inside BASLEY's stash house at 1953 Plymouth Street is similarly consistent with drug trafficking. More specifically, in my training and experience, firearms are commonly possessed "tools of the trade" used by traffickers to protect themselves, their illegal products, and their profits as evidenced by their presence inside residence in the same compartment where bulk cocaine was stored.

25. On August 20, 2026, HADDAD was arrested at his residence. After agents read HADDAD his *Miranda* warning as displayed on the FD-395 form, HADDAD signed the form and agreed to speak with agents. During the interview, HADDAD made several acknowledgements about his dealings with JONES. When asked about obtaining half kilograms of cocaine from JONES, HADDAD stated that he was, "not trying to say it's small, because I'm here" [indicating the FBI Building] but cautioned that, "anytime I dealt" with JONES "it didn't always have to do with drugs." After HADDAD was told that two days before JONES was arrested, HADDAD obtained a half kilogram from JONES on camera, HADDAD nodded affirmatively. HADDAD stated that he would, "have to deal with what he has to deal with" regarding the case.

26. Based on my training and experience and this case as a whole, I believe that the amounts supplied by JONES to HADDAD were consistent with distribution. This is based upon my observations of, and the discussions between, JONES and HADDAD, including the transfer of cocaine and bulk cash, as well as the terminology used to provide context to the discussions.

***CONCLUSION***

27. WHEREFORE, based on my training, experience, and my knowledge of this investigation, I have probable cause to believe, and do so believe, that JONES and HADDAD conspired and agreed to distribute cocaine, a Schedule II controlled substance, in violation of 21 U.S.C. § 846.

Respectfully submitted,

*/s/ Kevin M. Lewis*
KEVIN M. LEWIS, Special Agent
Federal Bureau of Investigation

Sworn to and subscribed to me telephonically this 20th day of August 2026.

Pamela A. Carlos
Digitally signed by Pamela A. Carlos
Date: 2026.08.20 19:37:26 -04'00'

HONORABLE PAMELA A. CARLOS
UNITED STATES MAGISTRATE JUDGE